THOMAS E. HANSEN, Guardian of the Estate and Person of Andrina Hansen, a Disabled Person, Plaintiff-Appellant, v. CARING PROFESSIONALS, INC., Defendant-Appellee (Mount Sinai Hospital Medical Center *et al.*, Defendants).

First District (4th Division)   No. 1—95—2346

Opinion filed February 20, 1997.

Edward J. Kionka, of Carbondale, and Lynne Plum Duffey, of Law Office of Paul B. Episcope, Ltd., of Chicago, for appellant.

Clausen Miller, P.C., of Chicago (James T. Ferrini, Richard G. Howser, Imelda Terrazino, and Richard H. Lehman, of counsel), for appellee.

PRESIDING JUSTICE WOLFSON delivered the opinion of the court:

Health care facilities are not always fully staffed. At times they ask a nurse agency to provide a nurse for a period of time. In this case, the nurse agency, Caring Professionals, Inc., assigned a nurse to the Mount Sinai Hospital Medical Center. A patient on that nurse's watch was injured. The patient's guardian sued the nurse agency, among others. The question is whether the nurse agency can be held vicariously liable for the negligent acts of the nurse.

The trial court granted summary judgment to Caring Professionals, holding that neither common law principles nor the Nurse Agency Licensing Act (225 ILCS 510/1 et seq. (West 1992)) makes the agency legally responsible to an injured patient for any negligent acts performed by the nurse at the hospital. We agree with the trial court.

## FACTS

Thomas Hansen (Hansen) filed a medical malpractice complaint. He alleged that Andrina Hansen (Mrs. Hansen) entered Mount Sinai Hospital Medical Center (Mount Sinai) on March 5, 1991, for a surgi-

cal procedure, which was performed without incident. While recovering from surgery, however, on March 8, 1991, a central venous catheter (CVC) attached to Mrs. Hansen's jugular vein allegedly became disconnected when one of the nurses was assisting Mrs. Hansen to a sitting position in her hospital bed. As a result, plaintiff claimed, air entered Mrs. Hansen's bloodstream through the disconnected catheter and an air embolus traveled to her brain, causing severe brain damage and total disability. Plaintiff brought suit against the hospital, several doctors, and others.

Later, Hansen's fourth amended complaint alleged that Eileen Fajardo-Furlin (Nurse Furlin) was one of the nurses who attended Mrs. Hansen during her stay at Mount Sinai, that Nurse Furlin worked at Mount Sinai on a temporary basis, and that she was referred to Mount Sinai by Caring Professionals, a nurse agency. Caring Professionals also was named as a party defendant. Caring Professionals' liability was premised on the alleged negligent acts of Nurse Furlin, who, Hansen claimed, was the agent and employee of *both* Mount Sinai and Caring Professionals.

Caring Professionals moved for summary judgment, claiming that, as a matter of law, it could not be held vicariously liable for the negligent acts of Nurse Furlin because Nurse Furlin was not the agent of Caring Professionals. In support of its motion, Caring Professionals submitted for the court's review the deposition testimony of Nurse Furlin and the affidavit of Susan Kim, Caring Professionals' director and manager.

According to the deposition and affidavit, Caring Professionals, a nurse agency licensed under the Illinois Nurse Agency Licensing Act (225 ILCS 510/1 *et seq.* (West 1992)), functioned as a referral service for registered and licensed nurses. Hospitals and other health care facilities contracted with Caring Professionals to obtain qualified nurses to fill temporary vacancies. When Caring Professionals provided a nurse to a facility, such as Mount Sinai Hospital, the health care facility paid Caring Professionals an hourly fee based on the type of nursing services provided. Caring Professionals, in turn, paid the nurses a portion of that amount.

Nurse Furlin, in her deposition, testified that Caring Professionals had no control over the manner in which she performed her duties at Mount Sinai. Mount Sinai, she said, supplied the equipment she used in the performance of her duties, including the catheter, tubing, and connectors attached to Mrs. Hansen, and directed her usage of this equipment.

In addition, Nurse Furlin's contract with Caring Professionals, like all of the agency's contracts with nurses, specifically stated that

her relationship with Caring Professionals was that of "independent contractor, not employer-employee." According to the contract, Nurse Furlin was responsible for obtaining her own worker's compensation, liability, and general property damage insurance. She also was responsible for paying her own income and social security taxes. These taxes were not withheld from Nurse Furlin's paycheck by Caring Professionals. For tax purposes, Caring Professionals did not provide any of its nurses with W-2 forms but, rather, provided them with 1099 independent contractor forms.

In response to Caring Professionals' motion for summary judgment, Hansen contended that the Illinois Nurse Agency Licensing Act specifically defined the relationship between nurse agencies and the nurses it referred as that of employer-employee. Alternatively, Hansen contended that Caring Professionals was not entitled to summary judgment because the facts created a material issue of fact whether Nurse Furlin was the agent of Caring Professionals.

The trial court rejected both of Hansen's contentions. Summary judgment was granted to Caring Professionals. This appeal followed. Our review is *de novo. Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 131-32, 607 N.E.2d 1204 (1992). Our goal is to determine from the record whether there is any material issue of fact that must be resolved at trial. *In re Estate of Hoover*, 155 Ill. 2d 402, 615 N.E.2d 736 (1993).

## OPINION

### 1. Liability Under Common Law

■ To determine whether there are any material facts supporting the existence of a master-servant relationship, we examine the form and substance of the relationship between Caring Professionals and Nurse Furlin. Absent a master-servant relationship, Caring Professionals cannot be liable for any acts of negligence that might have been committed by Nurse Furlin. *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 533, 513 N.E.2d 387 (1987).

First, the form.

The contract between the two defined Nurse Furlin as an "independent contractor." Caring Professionals did not withhold any income or social security taxes for Nurse Furlin. Instead, she received a form 1099. Caring Professionals provided no malpractice or other insurance, nor did it provide any employee benefits, insurance, or expenses. Nurse Furlin paid for her own transportation to the hospital. She provided her own uniform or the hospital provided one for her.

Caring Professionals was paid a fee by Mount Sinai Hospital, then it paid a portion of the fee to the nurse.

The form of the relationship, then, paints Nurse Furlin as an independent contractor.

Second, the substance.

Nurse Furlin cared for patients. That was her work. She used her skill, training, experience, and education to perform that work. She followed Mount Sinai's protocols and procedures for carrying out treatment plans. She used equipment provided by Mt. Sinai, not the nurse agency. The hospital determined which patients Nurse Furlin would care for and where in the hospital she would do it. Only the hospital supervised Nurse Furlin's work.

Caring Professionals did not and could not monitor Nurse Furlin's performance. In fact, Caring Professionals had no knowledge that Nurse Furlin was caring for Andrina Hansen or any other particular patient.

In short, Caring Professionals was a referral agency. It was not in the business of treating patients. It was the agency's duty to verify that Nurse Furlin's license was valid. Each year it evaluated her performance based on information provided by the health facility. It also made sure that Nurse Furlin had an annual health examination. These are matters of administration, not performance control.

The principles of law that apply to our analysis are well established. Our supreme court has said that critical to the determination of a master-servant relationship is the existence of "the right to control, which includes the power of discharge." *Gundich v. Emerson-Comstock Co.*, 21 Ill. 2d 117, 123, 171 N.E.2d 60 (1960).

The right to control what? The cases refer to "the right to control the manner and method in which the work is to be done." *Petersen v. U.S. Reduction Co.*, 267 Ill. App. 3d 775, 782-83, 641 N.E.2d 845 (1994).

This case strongly resembles *Joyce v. National Medical Registry, Inc.*, 170 Ill. App. 3d 141, 504 N.E.2d 243 (1988). In *Joyce*, National Medical Registry (NMR), a nurse registry, placed a certified registered nurse anesthetist (CRNA) at Graham Hospital. An injured plaintiff attempted to hold NMR responsible for allegedly negligent acts of the nurse. There, as here, the agency did not withhold income taxes or social security from the nurse's paycheck. No medical or health benefits were provided. There, too, the agency directly paid her salary. What mattered in *Joyce*, and what matters to us in this case, is that the agency "had no right to control the manner of Schroeder's [the CRNA's] work nor the time, place, and scope thereof." *Joyce*, 170 Ill. App. 3d at 144.

Hansen points to the "Guidelines" Caring Professionals gave to Nurse Furlin as evidence of control. We find the Guidelines are purely administrative and have nothing to do with the manner in

which work is to be performed. The 10 numbered paragraphs set out procedures for signing in and reporting. They include events, such as being intoxicated or sleeping on duty, that would cause immediate termination by a hospital. Most telling about the relationship between Caring Professionals and Nurse Furlin is the penultimate paragraph in the Guidelines:

> "C.P.I. [Caring Professionals] can offer as much or as little work as you want. We have both full-time and part-time work available. The decision of when, where, and how much to work is *entirely up to you.*" (Emphasis added.)

We find no material fact that would support a common law action based on master-servant vicarious liability.

2. The Illinois Nurse Agency Licensing Act

■ Hansen contends that, common law aside, the Illinois Nurse Agency Licensing Act (225 ILCS 510/1 *et seq.* (West 1992)) expresses an intent to hold nurse agencies vicariously liable for the negligent acts of nurses they refer to health facilities. He finds that intent in section 13(d) of the Act.

This is an issue of first impression. Having no decision to guide us, we must examine the statute, bearing in mind that the "cardinal rule of statutory construction, to which all other canons and rules are subordinate, is to ascertain and give effect to the true intent and meaning of the legislature." *Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc.*, 158 Ill. 2d 76, 81, 630 N.E.2d 820 (1994).

First, we look to the statutory language itself for the best indication of the legislature's intent. *Williams v. Illinois State Scholarship Comm'n*, 139 Ill. 2d 24, 51, 563 N.E.2d 465 (1990). Where the language of a statutory provision is clear, a court must give it effect without resorting to other aids for construction. *People v. Boykin*, 94 Ill. 2d 138, 141, 445 N.E.2d 1174 (1983). A court will examine the entire statute for guidance concerning the legislature's intent. *Springfield v. Board of Election Commissioners*, 105 Ill. 2d 336, 341, 473 N.E.2d 1313 (1985). Each section of the statute will be construed in connection with other sections. *Antunes v. Sookhakitch*, 146 Ill. 2d 477, 484, 588 N.E.2d 1111 (1992).

A court is authorized to look beyond the language of the statute when its statutory meaning is unclear. Then it may consider the purpose behind the law and the evils the law was designed to remedy. *Solich*, 158 Ill. 2d at 81. We see no need to look beyond the language of the Act in this case.

■ We are given one other useful rule of construction to guide

our inquiry into the meaning of the Act. The rule is made relevant by our finding that Caring Professionals cannot be held liable under common law principles for the negligent acts of Nurse Furlin. It is a well-established rule "that statutes in derogation of the common law are to be strictly construed in favor of persons sought to be subjected to their operation." *In re W.W.*, 97 Ill. 2d 53, 57, 454 N.E.2d 207 (1983). Our courts will read nothing into such statutes "by intendment or implication." *Barthel v. Illinois Central Gulf R.R. Co.*, 74 Ill. 2d 213, 220, 384 N.E.2d 323 (1978).

The Illinois Nurse Agency Licensing Act became law in July of 1990. It contains 15 sections. It repealed former section 9 of the Private Employment Agencies Act of 1935, a provision entitled "Nurses' registry." See Ill. Rev. Stat. 1989, ch. 111, par. 909.

Section 3 of the Act defines a "nurse agency" as "any individual, firm, corporation, partnership, or other legal entity that employs, assigns, or refers nurses or certified nurse aides to a health care facility for a fee." 225 ILCS 510/3(g) (West 1994). Caring Professionals is a nurse agency.

In section 2, the legislature expressed its intent:

> "The General Assembly intends to protect the public's right to high quality health care by assuring that nurse agencies employ, assign and refer licensed and certified personnel to health care facilities." 225 ILCS 510/2 (West 1994).

Nothing in section 2 hints at any intent to create the cause of action urged by the plaintiff in this case. Throughout the Act we see evidence of the legislature's desire to ensure proper licensing and certification of nurses placed at health facilities.

Sections 4 through 9 deal solely with licensing of the nurse agency. Section 14 imposes a number of duties on nurse agencies. It requires them, for example, to personally interview and annually evaluate the nurses they refer to health facilities. Nurse agencies are required to ensure that their nurses meet the minimum licensing, training, and orientation standards required by their license or certification.

■ Section 13(d), relied on by Hansen, is contained under the heading "Application for employment." It states:

> "Nurses or certified nurses aides employed, assigned, or referred to a health care facility by a nurse agency shall be deemed to be employees of the nurse agency while working for the nurse agency or on nurse agency employment, assignment, or referral." 225 ILCS 510/13(d) (West 1994).

Since this section, in effect, describes Nurse Furlin as an employee of the nurse agency, Hansen contends it necessarily follows that the legislature intended to impose vicarious liability on the

nurse agency for any negligent acts of its employee. We do not agree.

The legislature's use of the word "employee" in section 13(d) and in several other places in the statute must be considered in light of the scope of the legislation. That is, "the nomenclature in a statute designating a person holding a position as an officer or employee is not controlling." *Moy v. County of Cook*, 159 Ill. 2d 519, 528, 640 N.E.2d 926 (1994).

In *Moy*, the plaintiff sought to hold the County of Cook vicariously liable under a master-servant theory for the alleged negligent acts of the Cook County sheriff. One of the plaintiff's arguments was that provisions of the Workers' Compensation Act (Ill. Rev. Stat. 1989, ch. 48, par. 138.1 *et seq.*) and the Local Governmental and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1989, ch. 85, par. 1—101 *et seq.*) define and treat public officers as employees. These statutory definitions, said the court, "have no validity beyond the scope of the legislation in which they appear." *Moy*, 159 Ill. 2d at 530. In this case, we examine the word "employee" within the scope of an Act explicitly intended to assure that "nurse agencies employ, assign and refer licensed and certified personnel to health care facilities." 225 ILCS 510/2 (West 1992).

The plaintiff in *Moy* made an argument we have heard in this case. The plaintiff contended the sheriff functions to benefit the county, so there must be a master-servant relationship. The court rejected that approach:

> "In either case, whether one is a servant or an independent contractor, he functions for the benefit of another. Critical to the determination of a master-servant relationship is the existence of the right to control, which includes the power to discharge." *Moy*, 159 Ill. 2d at 525.

Nothing in the Act grants the nurse agency the power to control the work of the nurses it refers to a health facility.

We look to section 12 of the Act for the single occasion where the legislature considered matters of civil liability. The section is entitled: "Liability of nurse agencies." It begins with a clear statement of who is to have the responsibility for supervising nurses sent to health care facilities:

> "Health care facilities are responsible for supervising nurse agency employees assigned or referred to the facilities; however, where a health care facility is found liable for an injury to a patient or resident because of a negligent act performed by a nurse or certified nurse aide employed, assigned or referred by the nurse agency, the health care facility has a right to be compensated by the nurse agency for any and all expenses incurred related to any liability for the nurse agency's negligent hiring.

Negligent hiring by a nurse agency shall be the failure of an agency to follow the procedures outlined in Section 13 of this Act. This provision shall not otherwise limit in any way the actions a health care facility may have against a nurse agency at law or in equity." 225 ILCS 510/12 (West 1994).

Section 12 makes no attempt to establish vicarious liability of the nurse agency for the negligent acts of the nurses it refers. There is no indication in this section or any other section of the Act that the legislature was at all concerned about a claim by an injured patient. If there were legislative inclination to create a previously unknown master-servant relationship, section 12 was the place to do it.

The Act does, however, clearly establish a negligent hiring claim by a health facility against the nurse agency. For that purpose, the referred nurse is an "employee" of the agency. The negligent hiring cause of action is consistent with the legislature's goal throughout the Act—to ensure that the agencies send out nurses who are properly licensed or certified.

The legislature's choice of titles for the two sections we are examining lends further support to the conclusion we reach. Section 13(d), which contains the language relied on by plaintiff, is entitled "Application for employment." It does not suggest any intent to address an injured patient's negligence claim.

Section 12 is entitled "Liability of nurse agencies." It places the duty to supervise nurse agency employees directly on the health facility, not on the agency. This section contains the only reference in the Act to a personal injury lawsuit and compensation. Only the negligent hiring action—health facility against nurse agency—is specifically mentioned. And it is the violation of the employment procedures of section 13 that defines negligent hiring.

The title of an act may be considered when construing it. *Merchants National Bank v. Olson*, 27 Ill. App. 3d 432, 433, 325 N.E.2d 633 (1975). The official heading or title of a statute can provide guidance in interpreting a provision if its meaning is unclear. *People v. Lamb*, 224 Ill. App. 3d 950, 953, 587 N.E.2d 61 (1992). See also *People v. Malone*, 71 Ill. App. 3d 231, 232, 389 N.E.2d 908 (1979).

We note that the Nurse Agency Licensing Act was approved by the legislature on September 7, 1989, more than a year after *Joyce v. National Medical Registry, Inc.* was decided. *Joyce* was the only reported case in Illinois dealing directly with an injured patient's claim that a nurse referral agency was vicariously liable for the negligent acts of a referred nurse, a claim rejected by the court. Since we are able to presume the legislature acted with knowledge of the prevailing case law (*People v. Hickman*, 163 Ill. 2d 250, 262, 644

N.E.2d 1147 (1994)), we take the legislature's failure to directly address the matter of vicarious liability as further evidence it never intended to.

In short, this is a licensing statute. It creates no duty of the nurse agency to oversee, direct, or control the referred nurse's work performance. Holding the agency responsible for conduct it cannot oversee, direct, or control would run counter to ordinary notions of fairness. Without some clear direction by the legislature, we will not read the Act in the manner urged by the plaintiff. The plain and ordinary words of the Act lead us to conclude the legislature did not intend to establish a nurse agency's vicarious liability for the negligent acts of a nurse referred to a health facility.

## CONCLUSION

For the reasons stated, the trial court's grant of summary judgment to Caring Professionals, Inc., is affirmed.

Affirmed.

McNAMARA and CERDA, JJ., concur.